UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Dakota Gasification Company, | ) | |
| | ) | |
| Plaintiff / Counter-defendant, | ) | |
| | ) | |
| v. | ) | Civil No. A1-04-25 |
| | ) | |
| Marley Cooling Technologies, Inc., | ) | |
| | ) | |
| Defendant / Counter-claimant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER FOR JUDGMENT**

This matter was tried to the magistrate judge on consent of the parties. A bench trial was held in Bismarck, North Dakota in October 2005. This memorandum opinion contains the court's findings of fact and conclusions of law.

I.  **INTRODUCTION**

This case arises from a contract dispute between Dakota Gasification Company [hereinafter "DGC"] and Marley Cooling Technologies, Inc. [hereinafter "Marley"]. The parties entered into a contract in August 2002. DGC hired Marley to build cooling channel tower and sump gratings at DGC's coal gasification plant. The contract divided the work into two separate phases. Phase I involved construction of a grating cover over the cooling tower channel. Phase II consisted of the construction of a grating cover over the sump grating. Phase I was completed pursuant to the contract. Problems arose during Phase II, which ultimately led to DGC terminating the contract with Marley. DGC seeks to recover the additional costs, above the original contract price, which DGC paid another contractor to complete. Marley

counterclaims for the amount it paid an engineering subcontractor for design work required by DGC's alleged changes to the project.

## II.   FINDINGS OF FACT

1. On August 5, 2002, the parties entered into a contract under which Marley would build gratings for the cooling channel tower and sump at DGC's coal gasification plant near Beulah, North Dakota.

2. The total contract price was $636,226.00.

3. The contract contemplated two phases of construction.

4. The contract price was allocated as follows:

| | |
|---|---|
| Phase I | $450,786.00 |
| Phase II | $174,804.00 |
| Taxes for both phases | $10,636.00 |
| TOTAL | $636,226.00 |

5. Phase I was completed pursuant to the contract.  The parties have no dispute regarding Phase I.

6. Article 1 of the contract, stated: "Time is of the essence and is of major importance that all parties take all reasonable efforts to ensure the Work is performed in a timely manner." Ex. 101.

7. The contract also provided DGC could delay Phase II work until 2004. Ex. 101.

8. The specifications of the contract are set forth in an appendix titled "Specification 381082." Ex.101; App. H.

9. The contract specifications stated: "The sump area work shall be installed during Owner's 'black plant' outage tentatively scheduled to begin June 1, 2003, lasting for 2 weeks.

During this two-week period, the cooling tower shall be empty." On November 25, 2002, DGC informed Marley that it must complete Phase II during plant operations, not during a black plant outage as originally contemplated.

10.  The contract required Marley to get DGC's approval of design calculations before ordering materials. Specifically, the contract stated: "[DGC's] review signature shall be required on each drawing before material is purchased or drawing issued for construction." Ex.101; App. H.

11.  The contract's general conditions discussed termination for default:

> Should [Marley] become insolvent or fail in the performance of any obligation under the Agreement, [DGC] shall have the right to terminate the Agreement upon forty-eight (48) hours written notice served upon or delivered to [Marley] or [Marley's] duly authorized representative. The exercise of the right to terminate shall not constitute a waiver, or bar any legal recourse [DGC] may have arising from [Marley's] default.

Ex. 101; App. A.

12.  The contract also contained a provision allowing for cancellation for convenience:

> [DGC] shall have the right to cancel the Agreement or any portion of the Agreement for its convenience at any time by written notice to [Marley]. On the date of such cancellation stated in said notice, [Marley] shall discontinue all canceled Work pertaining to the Agreement, shall place no additional orders related to said canceled portion and shall preserve and protect materials on hand purchased for or committed to the Agreement. Upon such cancellation, [Marley] shall be paid the earned portion of the total cost of all canceled Work completed as of the date of cancellation. The earned portion is that part of the Work which has been performed by [Marley] and for which [Marley] has expended resources. Any materials and equipment paid for by [DGC] as a result of cancellation of the Agreement shall become property of [DGC].

Ex. 101; App. A.

13.  The specifications in the contract provided for the grating and structural components to support live loads as follows:

      i)        Uniform load of 50 psf on all grating areas.
      ii)       A 1000 pound concentrated load across any one-foot width of grating bearing bars in the sump area.  A 600 pound concentrated load across any one-foot width of grating bearing bars in the channel area.
      iii)      A 500 pound concentrated vertical load on any one ladder rung.
      iv)      A 500 pound concentrated horizontal load on any one ladder post.
      v)       A 200 pound load applied in any direction to the top handrail.
      vi)      [Marley] shall determine the side loads on the traveling screens, based on information supplied.

Ex.101; App H.

14.     The contract stated the structural members could be either fiberglass or stainless steel. Stainless steel materials had to be minimum grade 304 SS.  Ex.101; App. H.  The purpose of the structure was to support "traveling screens" used for filtering.

15.     Under the contract, DGC retained the "right by writen notice to [Marley] to make changes to the Agreement."  Ex.101; App. A.

16.     Under the contract with Marley, DGC "reserv[ed] the right to furnish, either through its own forces or third parties, supervision, labor, equipment, tools, supplies, materials and related services necessary to perform the Work."   Ex. 101; Art. 6.

17.     The contract stated Marley was to begin Phase II—construction of the grating cover over the sump area—on May 28, 2003 and complete the project by June 16, 2003.

18.     Marley hired Don Carter's firm as its design engineer.  Carter helped Marley prepare its bid.  Initially, Carter proposed using concrete beams, based on Marley's experience with concrete construction and Carter's understanding that the contract specifications would allow the engineer to choose material other than fiberglass or stainless steel.  That initial proposal was rejected, so he based the bid on fiberglass reinforced plastic.  Thus, Marley's bid was not based on concrete, as suggested by DGC's post-trial brief.

19.     Don Carter testified the contract was "pretty weak" in specifications, allowing the contractor to pick its own specifications. Carter communicated, primarily through electronic mail, with DGC representatives to determine exact specifications for the design. These communications began in October 2002.

20.     Although a summary of each communication is unnecessary, the exhibits received by the court at trial from both parties demonstrate a continuing series of questions to facilitate the process of refining the design. The court will specifically discuss some of the communications, in chronological order.

21.     On October 10, 2002, DGC communicated to Marley that "in the sump area it is our intent to design a heavy structure and all loads should act simultaneously." Ex. 155.

22.     Don Carter, Marley's design engineer, testified he was not previously aware of such a requirement for the design.

23.     On December 2, 2002, DGC, through its product engineer Brad Weeda, notified Don Carter that the heaviest "traveling screen" weighed "approximately 21,000 lbs." Ex. 102.

24.     On December 4, 2002, Don Carter submitted a design methodology to DGC and sought confirmation that the "structural main members must be stainless steel. Alternate material is unacceptable in Phase II." Ex. 103.

25.     On December 5, 2002, DGC responded: "This is correct." Ex. 104.

26.     On December 28, 2002, Don Carter submitted his initial design calculations to DGC. Ex. 105. Carter testified he based his design on a deflection factor of L/240.

27.     On January 8, 2003, DGC informed Marley that the design must be based on 304 stainless, not carbon steel beams, and the sump cross beams must maintain a deflection criteria

of less than L/360. This was the first time DGC identified a specific deflection criteria. Ex. 134.

28.     At a January 28, 2003 construction meeting, Don Carter stated DGC's limitation of choice of material for support members to stainless steel may require a change order. He felt DGC's load and deflection criteria eliminated fiberglass reinforced plastic as a material and allowed only stainless steel beams at least W16X26. DGC representatives at this time disagreed that DGC had limited Marley to using only stainless steel. They explained that DGC had confirmed stainless steel as the required material in their December 5, 2002 communication because "the methodology statement suggested to them that stainless steel was the material recommended by [Carter] because the size of the fiberglass members would be design prohibitive." Ex. 106.

29.     At the same January 28, 2003 construction meeting, DGC informed Marley that the old "traveling screens" installed over the sump grating would be removed and new "traveling screens" would be installed during Phase II. DGC stated the weights of the new motor-driven screens "may be significantly different." No specific weights were provided. Don Carter questioned the location of the support points for the screens and whether the weight would be a point or uniform load. Ex. 106. Carter testified the steel beams would be fabricated with bolt holes for mounting the screens, so he needed to know the exact mounting points before fabrication of the steel beams.

30.     At the same time, Marley stated it planned to use Amerex as its steel supplier. Marley selected Amerex because it was the only supplier Carter knew could supply beams of the size needed. DGC voiced no objection to Amerex as the chosen supplier. Ex. 106.

31.     On January 30, 2003, Marley informed DGC that Amerex would need 28 weeks to make

the steel support beams once DGC approved the design.  Ex. 107.

32. On February 18, 2003, DGC informed Marley that the design needed to accommodate an increase in the traveling screen loads of 20%.  Ex. 108.1.

33. On March 3, 2003, Don Carter informed Brad Weeda at DGC that he was "[s]tarting from scratch now to meet design based on the 120% dynamic multiplier."  Ex. 110.  Carter testified DGC's requirement for load distribution across the entire screen necessitated a "gross overdesign."

34. On April 23, 2003, Don Carter received the drawings and specifications for the new traveling screens in an accessible electronic format.  DGC initially sent them on April 10, but Carter was unable to view them.  Ex. 111.4.

35. From April 23 to April 25, 2003, Carter communicated with DGC by email about the weight distribution of the new screens.  Carter concluded the weight of the new traveling screens was so imbalanced to one side that the project needed a stronger support system.  Marley informed DGC the larger beams would increase the cost of the project, and Marley would procure materials upon approval of "a cost ADD to support."  Ex. 111.12.

36. On April 25, 2003, a Marley procurement employee wrote to Carter, "Think we are in trouble with supplying SS."  Ex. 111.15.

37. The parties executed a change order extending Phase II's completion date to October 31, 2003, but providing for no change in compensation.  The effective date of this change order was April 30, 2003, the date DGC signed and authorized it.  Marley signed its acceptance of the change order on May 6, 2003.  Ex. 112.

38. During May 6 and 7, 2003 telephone calls between DGC and Marley representatives,

DGC expressed concern about Marley's ability to complete the contract on time. Although DGC did not use the term "adequate assurance," it apparently asked Marley to report how performance would be accomplished.

39. On May 8, 2003, Marley wrote to DGC expressing concern about the support system requirements:

> Our initial pass at the design analysis produced a 14" deep beam transverse and 8" longitudinal. After the meeting in January, there was a 20% dynamic factor imposed and was advised that there would be no relief on the L/360 requirement. The L/360 requirement was not a part of the original spec and after imposed, eliminated the use of fiberglass material, which was one of your two choices of material. This raised the stainless steel beam size to W16X26. Originally screen removal was not in our scope of work but then there was the decision to purchase new screens. New screen weights plus an interpretation of the screen vendor requirements by Fred Kalus [of DGC] drove the beam size up to W16X36 several weeks back and that is what our procurement people have been trying to locate.

Marley expressed its opinion that the changes would result in "much greater" costs than contemplated by the original design. Marley specifically stated delivery of the steel required by the design would be at least 30 weeks. Due to the lengthening delivery schedule for the stainless steel beams, Marley recommended that the 20 percent dynamic factor and the L/360 deflection requirement be lifted in some areas of the design "to allow use of smaller beams with potentially a smaller lead time." Alternatively, Marley suggested "postpon[ing] the project to a later date to avoid the winter climate during installation." Marley requested a meeting to discuss the issues. Ex. 114.

40. On May 14, 2003, DGC wrote to Marley and stated the contract was "Terminated for Default effective May 16, 2003." The letter also stated Marley's May 8 letter did not provide the "adequate assurance" requested by DGC during the May 6 and 7, 2003 telephone conversations.

Ex. 115.

41.     Also in the May 14, 2003 letter, DGC stated that "please note that our inquiries indicate that the beams are readily available and can be procured within 30 days."  Ex. 115.

42.     Two witnesses, Marley's project manager and reconstruction manager, testified DGC never requested that Marley provide adequate assurance.

43.     The parties engaged in subsequent written communications with both sides asserting the other party had breached the terms of the contract.

44.     DGC hired a firm to prepare the Phase II design.  DGC then directly ordered the materials and hired a new contractor to perform the installation.  The project was completed about November 1, 2003.

45.     DGC paid $270,511.56 for materials and labor to complete Phase II.  DGC calculated its damages by subtracting the amount it would have paid to Marley for Phase II ($176,332.60) from the amount paid to the new contractor ($270,511.56).  DGC claims damages in the amount of  $94,178.21.

46.     DGC's new contract was not offered into evidence.

47.     Marley counterclaimed for the sum of $4,262.50.  Marley asserts it paid Don Carter this amount for design work performed on Phase II due to changes imposed by DGC.

**III.    CONCLUSIONS OF LAW**

To sustain a breach of contract claim, DGC must demonstrate (1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach.  United States v. Basin Elec. Power Co-op, 248 F.3d 781, 810 (8th Cir. 2001) (applying North Dakota law). DGC bears the burden of proving each element.  Id.

The first element—the existence of a contract— is undisputed.  Thus, the court must consider whether, as alleged by DGC, Marley materially breached the contract by failing to perform.  If such a material breach occurred, DGC was justified in terminating the contract under the default provision of the contract.  Under North Dakota law,

> '[A] material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange.' United States v. American Employers' Ins. Co., 192 F. Supp. 873, 877 (D.N.D. 1961).  See Restatement (Second) of Contracts § 253(2).  An obligor repudiates the contract when he makes a statement indicating he will breach it or takes voluntary, affirmative action which renders him unable or apparently unable to perform the contract.  Restatement (Second) of Contracts § 250.  To determine if the breach was material, the court must look at the totality of the events and circumstances.  Stone Forest Indus. Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992).  See Restatement (Second) of Contracts § 241 & cmt. a.

Monarch Photo v. Qualex, Inc., 935 F. Supp. 1028, 1033 (D.N.D. 1996).

The evidence demonstrates the parties had disagreements throughout the design process.  Two primary points of contention were the load factor and the deflection criteria.  The court concludes DGC made significant changes to the originally contemplated design requirements, beginning with the decision to implement Phase II construction while the plant was operational.  The most significant changes were DGC's load and deflection requirements and its decision to replace the "traveling screens."  Marley requested that DGC provide the specifications for the new screens; Don Carter's communications with DGC and his testimony at trial demonstrate he repeatedly requested this information.  Significantly, Marley did not receive specifications for the new traveling screens until April 23, 2003.  At that time Marley's steel supplier quoted a delivery period of at least 30 weeks for stainless steel beams meeting the load and deflection requirements.

The court recognizes the contract allowed DGC to make changes.  As demonstrated by

10

Marley's letter on May 8, Marley continued to work to meet DGC's changes in specifications. DGC could not realistically expect that its changes would not impact Marley's ability to timely perform the contract. While the communications from Marley to DGC demonstrate frustration with DGC's changes, Marley never indicated it would not or could not perform under the contract.

The court also recognizes DGC was concerned about the timeliness of the Marley's performance, especially in light of the lead time Marley said it needed to order the stainless steel. DGC alleges it demanded adequate assurance[1] and that Marley failed to provide such assurance. The evidence does not establish that DGC clearly demanded adequate assurance during the May 6 and 7, 2003 telephone calls, but even if DGC did make an oral demand for adequate assurance, it has not shown that Marley materially breached its obligation to duly perform the contract. In its May 8, 2003 letter, Marley stated the combination of materials requirements and availability resulted in a 30-week delivery time frame for the stainless steel beams. In order to shorten that time frame, Marley recommended lifting the materials requirements in some areas. This recommendation arose from Don Carter's opinion that DGC's requirements resulted in a "gross overdesign." Alternatively, Marley suggested a delay in installation until the next spring. Marley also raised a concern about additional costs resulting from changes in materials

---

[1] The disposition of this case does not require a lengthy discussion of the term "adequate assurance." In contracts for sale of goods, North Dakota law provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party, the other party may in writing demand adequate assurance of due performance." N.D.C.C. § 41-02-72(1). Although the court questions whether this contract is appropriately considered a sale of goods, the comments to the Restatement of Contracts are instructive as they indicate a written demand for adequate assurance is not always necessary. Restatement (Second) of Contracts, § 251, cmt d. The parties in this case disagree whether DGC actually made an oral demand for adequate assurance and, if so, whether it was made in good faith. However, this court has concluded that Marley did not breach its performance obligations under the contract. Absent such breach, DGC had no grounds upon which to invoke the doctrine of adequate assurance.

requirements.  Marley did not refuse to perform; rather, it asked for a meeting with DGC to discuss possible solutions to the problematic situation.

It is true that the 30-week delivery estimate for the steel beams put Marley's likely completion date beyond the October 31, 2003 date specified in the April 30, 2003 change order. The contract did provide time was of the essence.  However, the contract also provided that DGC could delay Phase II for an entire year.  Thus, the contract demonstrates the parties contemplated some flexibility with respect to completion of Phase II of the contract.

Marley could have met the completion date but for the 30-week delivery estimate by its stainless steel beam supplier.  By the time DGC terminated the contract, it had checked around and knew it could get stainless steel beams in a shorter time.  Instead of sharing that information with Marley or ordering the steel directly and allowing Marley to install it, as the contract allowed, DGC chose to fire Marley.

Marley did not breach the contract in any material respect.  Rather,  Marley encountered delays in completing the work under the contract due to the changes imposed by DGC.  The contract permitted DGC to cancel the contract for convenience.  (See Finding #12).  However, DGC did not prove it had grounds to terminate the contract for failure to perform.  Because DGC did not prove Marley breached the contract by failing to perform, DGC cannot seek to recover damages.  Thus the court does not need to address DGC's damage calculations.

Marley has counterclaimed for the amount it paid to Don Carter for additional design work, due to the changes in the specifications.  The cancellation for convenience provision of the contract stated:

> [Marley] shall be paid the earned portion of the total cost of all canceled Work completed as of the date of cancellation.  The earned portion is that part of the

> Work which has been performed by [Marley] and for which [Marley] has expended resources. Any materials and equipment paid for by [DGC] as a result of cancellation of the Agreement shall become the property of [DGC].

Ex. 101; App. A.  If Marley had submitted to DGC at the time of termination all of the design work performed by Don Carter, the counterclaim would have merit.  There is no evidence that Marley did submit all of Don Carter's design work for DGC's use.  Instead, DGC paid someone else to design and build Phase II.  DGC should not be required to pay for the design work twice.  The court concludes Marley is not entitled to recover the $4,262.50 it paid to Don Carter for extra design work.

## IV.   ORDER FOR JUDGMENT

**IT IS ORDERED** that judgment be entered dismissing DGC's claims against Marley with prejudice and dismissing Marley's counterclaim against DGC with prejudice.  Neither party shall be awarded costs.

Dated this 3rd day of May, 2006.

Karen K. Klein
United States Magistrate Judge